LANDRY, Judge.
Plaintiff, Dawson Engineers, Inc. (Appellant), appeals from judgment dismissing its claim against defendant, Reichhold Chemical, Inc. (Reichhold), for engineering fees allegedly due for professional services rendered pursuant to an oral contract to prepare plans for an addition to Reichhold’s chemical plant located at Gulfport, Mississippi, and alternatively for judgment on quantum meruit. We affirm.
The decisive issue is the disputed nature of the agreement between the parties. Appellant relies upon an avowed oral agreement to provide engineering services in the form of complete construction plans for a plant expansion proposed by Reichhold. Conversely, Reichhold maintains that Appellant voluntarily offered to provide plans for a turn key plant addition including fabrication and installation at a price within Reichhold’s pre-set budgetary limitation, engineering fees included. Reichhold contends it was understood that if the proposed addition could not be built for the total allocation authorized by Reichhold’s budget committee, Appellant was to receive no engineering fees for preparation of plans.
The following relevant background facts are either undisputed or established in the record: Reichhold, whose domicile is White Plains, New York, operates an industrial chemical plant in Gulfport, Mississippi. Since May, 1968, O. U. Thomas (Thomas), has been Manager of Reichhold’s plant. Appellant, a corporation wholly owned by William J. Dawson (Dawson), is a consulting engineering firm. In addition to Dawson Engineers, Inc., Dawson also owned or controlled a fabricating business which complemented his engineering enterprise. In 1969, Dawson became president of a fabricating concern known as Mechanical Maintenance (MM), which concern he continued to operate. Prior to Dawson’s acquisition of MM, Thomas had placed numerous orders with MM for plant components which MM constructed and installed at Reichhold’s Gulfport plant. In each instance Thomas issued a purchase order to MM for a package or turn key price which included engineering fees, fabrication, and installation of the component purchased. In each instance MM billed Reichhold on the basis of Thomas’s purchase order.
Thomas continued doing business with MM after Dawson’s acquisition of that concern. From 1969 to about mid 1970, Thomas placed purchase orders with MM aggregating approximately $135,000.00. The procedure remained the same as before. In each instance Thomas issued a written purchase order pursuant to a verbal agreement whereby MM undertook to provide the order complete, engineering fees, fabrication and installation included. Upon completion of the order MM billed Thomas for the work.
Prior to March, 1970, Thomas, as Reich-hold’s agent, began negotiations with a firm known as Ford, Bacon and Davis, (FB&D), for preparation of complete plans for the addition of a catalytic hydrocarbon resin plant to Reichhold’s Gulfport facility. On March 3,1970, pursuant to authorization by Reichhold’s Budget Committee, Thomas entered into a contract with FB&D whereby Reichhold agreed to pay an engineering fee of $20,000.00 for a complete set of plans for a catalytic hydrocarbon resin plant with a capacity of 25 million pounds per year. The plans for the project, introduced in evidence, are complete in minute detail including engineering, electrical, instrumentation and sizing of all components. FB&D *1061 estimated the cost of construction at between $5 and $7 million dollars. The plan was disapproved by Reichhold because the Budget Committee had allocated only $1,500,000.00 for the proposed project. Reichhold paid FB&D the agreed engineering fee of $20,000.00, despite its disapproval of the project as too costly.
Appellant was aware of the agreement between Reichhold and FB&D because FB&D had priced certain components through Dawson’s fabricating facilities. When Reichhold dropped the proposed project, negotiations commenced between Appellant and Reichhold, through Thomas, concerning the possibility of Appellant preparing plans for the addition desired by Reichhold and which addition could be constructed within Reichhold’s budget limitation. The parties’ versions of how these negotiations began and what was agreed upon is conflicting, to say the least.
Dawson’s testimony is that Thomas contacted him after Reichhold’s disapproval of the FB&D plans. At Thomas’s request, Dawson went to Gulfport sometime after July 3, 1970, to discuss the matter with Thomas who orally agreed that Reichhold would pay Appellant an engineering fee of 4% of estimated construction costs for the plans. If the plant were built, Thomas agreed to a fee of 15% of all direct labor costs for supervision and construction, Reichhold to furnish all materials. Pursuant to the agreement, Dawson assigned virtually all his staff to the project for several months. The work required hundreds of man hours beginning in late July, 1970. Plans were prepared for two different facilities and submitted to Thomas in late 1970 and early 1971. The work entailed numerous conferences with Thomas who requested numerous changes as the plans progressed. No purchase order for this work was requested of Thomas because Dawson felt Thomas’s verbal authorization was good enough. Numerous requests were made of Thomas to pay the fee of $109,000.00 due because estimated construction costs ran between $2 and $3 million dollars for the first plans submitted, which were for a resin ester facility, the second set being for a hydrocarbon resin plant. Both plans were sufficiently complete that they could be used for construction. Dawson did not bill Thomas for the engineering services involved until August 12, 1974, despite completion of the plans in early 1971, because Dawson relied upon Thomas’s repeated verbal assurances the fee would be paid when money became available. He conceded that some of the work shown on one of the plans was the subject of a purchase order issued by Thomas and which Reichhold paid in full.
Fred Lieux, an engineering technician in Appellant’s employ, in essence corroborated Dawson’s testimony to the effect that the agreement with Thomas called for an engineering fee to be paid for the plans regardless of whether the plant was constructed.
Thomas’s testimony is that after Reich-hold’s Budget Committee rejected the FB&D plans because of the cost factor, Reichhold scrapped its proposal to add a resin ester facility to the Gulfport plant. In late July, 1970, Lieux contacted Thomas regarding the status of project proposed by FB&D and was advised the project had been abandoned as too costly. Lieux inquired whether Thomas was interested in reviving the project if the cost could be trimmed to a practicable figure. Thomas replied he did not know but that Thomas considered the project dead for the moment because no funds were available. Lieux proposed that he speak with Dawson and determine whether Dawson was interested in the project. In July, 1970, Thomas met with Dawson and informed Dawson that all funds allocated for engineering services for the proposed project had been spent and no more money was available for that purpose at the time. Dawson asked if Thomas would be interested if costs could be reduced. Thomas responded in the affirmative and indicated that he felt the FB&D plans contained a lot of “fat” which could be eliminated. Thomas indicated interest in a plan that could be implemented within an allocated construction budget of $1,500,-000.00 set by Reichhold’s Budget Commit *1062 tee. Thomas inquired how Dawson expected to get anticipated engineering fees for purely engineering services since Thomas had no money available for that purpose. Dawson responded that if he could get the fabrication and installation work he could recoup engineering expenditures. Dawson also stated that he was then in between big jobs and had people on his payroll with no work to do and whom he had to pay whether or not they worked, therefore Dawson could do the plans at virtually no additional cost. After this initial conference with Dawson, Dawson came to Gulfport accompanied by his aides Lieux, Bobby Joe Kiper and Betty Spell, to further consider the matter. Thomas gave Dawson a complete set of the FB&D plans and took Dawson and his employees on a tour of the Gulfport plant. After explaining in detail the nature of the plant desired, Thomas made it clear to Dawson that Thomas had no funds available for engineering services on the project and that Dawson would be paid only if Dawson designed a plant which fulfilled Reichhold’s requirement and which could be built within the construction budget allocated therefor. With this understanding, Thomas consulted frequently with Dawson and Dawson’s staff. He concluded at the outset that Dawson did not grasp the chemical aspects of the project. He noted that Dawson did not have a chemical engineer working on the plans although the project involved an intricate knowledge of chemical engineering. Thomas commented upon Dawson’s not having a chemical engineer involved in the planning and was advised that Dawson would engage a chemical engineer for the fabrication and installation stages of the work. In consulting with Dawson, Thomas made numerous trips to Baton Rouge, sometimes staying over the week end at Dawson’s expense. Thomas conceded that numerous changes were made as work on the plans progressed, some to correct Appellant’s mistakes and some resulting from Thomas’s attempts to bring the cost factor in line with the budget allocation for the project. Thomas stated the first plan was disapproved by the Budget Committee because estimated construction cost was $1,900,000.00. The second set of plans was also disapproved because estimated construction cost was excessive. Thomas also testified both sets of plans were incomplete and useable only for submission to his Budget Committee to determine cost feasibility. He contended that neither set was sufficiently detailed to be put out for construction contract bids because of deficiency in electrical and instrumentation detail.
Thomas noted it was customary that he issue a purchase order to Dawson for all work Reichhold desired. On every occasion that work was ordered, Thomas issued a purchase order, the last having been issued on February 25, 1972, for $30,000.00, which was paid in May, 1972. Thomas identified several purchase orders and noted that in each case engineering fees were included in the total price which also included fabrication and installation at Reichhold’s plant. He emphatically denied having ever contracted with Appellant for engineering fees per se. He also stated that after he notified Appellant of the disapproval of the second set of plans in about February, 1971, Thomas heard nothing further from Appellant concerning engineering fees until August, 1974, when Appellant called and requested payment of an engineering fee of from $3,000.00 to $5,000.00 for work on the plans in question. He again told Appellant no money was available for such purpose. Shortly thereafter, Thomas received a bill from Appellant for $109,000.00. Thomas denied he had authority to enter an engineering contract with any firm whatsoever. He explained that all such agreements were made pursuant to direction of the Budget Committee after authorization by Reich-hold’s Board of Directors as had been done in the case of the agreement with FB&D.
The trial court concluded Thomas’s version of the arrangement between these parties was the more plausible and reasonable. We agree. It seems eminently more reasonable that if Thomas issued a purchase order for the numerous small jobs performed by Appellant and MM over the years, as the record shows, it is most unlikely he would not have issued a purchase *1063 order for work of the magnitude and scope undertaken by Appellant. Significantly, Thomas issued a purchase order to FB&D for a $20,000.00 commitment for engineering fees per se, a sum approximately one-sixth of that claimed by Dawson for such fees. We also note the time lag between the completion of plans by Appellant and the billing date. We find it most unusual that Appellant would wait such an inordinately long period before presenting a bill for his services if the agreement were that the engineering fees were for plans only as Appellant contends.
Reichhold invokes the rule announced in Canter v. Koehring Company, 283 So.2d 716 (La.1973), to the effect that when there is evidence before the trier of fact, which upon its reasonable evaluation as to credibility constitutes a reasonable basis for the trial court’s finding, on review the appellate court should not disturb such findings except when manifest error is shown.
We are mindful of the rule in Canter, above, but do not rely thereon in our affirmation of the judgment rendered by the trial court. Our independent analysis of the record before us leads to the conclusion that the overwhelming preponderance of evidence supports Thomas’s version of the agreement between these parties. We find that under the agreement reached herein, Appellant was not entitled to engineering fees simply for preparing the plans submitted.
The judgment of the trial court is affirmed at Appellant’s cost.
Affirmed.